1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRENDA L. NORTH,

                    Plaintiff,

        v.

STATE OF WASHINGTON;

WASHINGTON STATE GAMBLING

COMMISSION,

                    Defendant.

Case No. 3:23-cv-05552-TMC

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

In August 2021, Washington Governor Jay Inslee issued Proclamation 21-14 ("the Proclamation"), which required all state agency workers be fully vaccinated against the COVID-19 virus. To comply with the Proclamation, Defendant Washington State Gambling Commission ("the Commission") instituted a vaccine mandate for its employees. Under this mandate, and consistent with the Proclamation, employees could seek an exemption from the vaccination requirement based on their sincerely held religious beliefs. The Proclamation required employers to provide religious accommodations unless doing so would cause undue hardship, consistent

with the requirements of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Washington Law Against Discrimination ("WLAD").

Plaintiff Brenda North was employed by the Commission as an IT Quality Assurance Journey. North alleges that her sincerely held religious belief conflicted with receiving the COVID-19 vaccine. North asserts that the Commission could have reasonably accommodated her by allowing North to continue working while taking protective measures such as personal protective equipment (PPE) and COVID testing. Alternatively, North argues that the Commission could have allowed her to work outside of business hours or work remotely. Instead, the Commission terminated her employment because North did not get vaccinated by October 18, 2021—the deadline provided by the Proclamation.

Having considered the briefing, governing law, and the balance of the record, the Court concludes that Defendants State of Washington and the Commission have proven as a matter of law that accommodating North would have posed an undue hardship to their business. The Court thus GRANTS Defendants' motion for summary judgment and DISMISSES North's claims with prejudice.

## II.    BACKGROUND

This case arises out of North's request for an accommodation for her religious objections to the Commission's COVID-19 vaccine mandate. The following facts are either not genuinely disputed in the summary judgment record or taken in the light most favorable to North, the non-moving party.

The Commission is a "limited jurisdiction Washington State law enforcement agency that licenses, regulates, and enforces law regarding gambling in Washington." Dkt. 27 ¶ 3. The Commission's mission "is to ensure that gambling in Washington is legal and honest" and it "conducts a regulatory and enforcement program, investigates illegal activities, and builds

partnerships with tribal casinos and other partner organizations." *Id.* As of August 2021, the Commission had about 95 employees. *Id.* ¶ 23.

**A.    North's Employment at the Commission**

Plaintiff North was employed by the Commission since 1997 and worked as an IT Quality Assurance Journey until her termination on October 18, 2021. Dkt. 34 ¶ 3; Dkt. 27 ¶ 22. North worked primarily in the Electronic Gambling Lab (the "Lab") which is "responsible for testing gambling equipment that is deployed in authorized locations throughout the State to ensure that it is functioning properly and in compliance with state law." Dkt. 28 ¶ 2. The Lab was the only lab operating in this capacity in the state of Washington. Dkt. 34 ¶ 15. North's position in the Lab "support[ed] [the Commission's] mission by conducting highly technical reviews of electronic gambling systems and equipment to verify compliance with applicable laws, rules, and Tribal-State Compacts." Dkt. 27-2 at 2. She also "assist[ed] state and tribal gaming regulators by conducting reviews of deployed systems, incident investigations, training stakeholders, and providing expert technical advice on assigned systems." *Id.*

North was one of six lead testing engineers that worked in the Lab. Dkt. 27 ¶ 13; Dkt. 28 ¶ 3. Manufacturers of gambling equipment would send their equipment and software to the Lab where it was tested and certified as legally compliant. Dkt. 28 ¶ 4. Each testing engineer was assigned two to three manufacturers and was responsible for being a subject matter expert on the equipment and software that the manufacturers submitted for testing. *Id.*; Dkt. 27-2 at 2. North's specific job duties were the following:

- Independently performs critical analysis and testing on hardware, software, operating systems, networks, databases, and security used in electronic gambling systems and games for adherence to accepted security practices, resistance to malicious intrusion/manipulation, ensuring compliance with Revised Code of Washington (RCW), Washington Administrative Code (WAC), and Tribal-State Compacts.

- Independently manages and tests complex projects for Tribal Lottery System and non-tribal electronic gambling equipment within defined timelines.

- Advises and trains stakeholders and regulatory staff on assigned gambling equipment, acting as the State's subject matter expert on electronic gambling equipment.

- Inspects and investigates compliance related incidents of live electronic gambling systems.

- Performs other duties as required as they relate to the functioning of the Electronic Gambling Lab and the agency.

Dkt. 27-2 at 2–3.

Because state law prohibits electronic gambling equipment from being used outside of designated locations, lead testing engineers were required to evaluate the equipment in the Lab, in a manufacturer's facility, or in a tribal casino. Dkt. 28 ¶ 4; *see, e.g.,* Dkt. 27-2 at 3–4 ("Tasks include: . . . Installs, configures, and troubleshoots gambling system software, hardware, and networks in lab environment for testing purposes. . . . Uses software auditing tools such as EagleCheck2 and GL1 Verify® to verify software signatures on electronic gambling equipment and components that manufacturers submit to the Lab. . . . Conducts hands-on inspections of electronic gambling systems to verify compliance and security."). These engineers were also required to go into casinos to test gambling equipment in a deployed setting and verify that the equipment was set up in compliance with state laws and the Tribal-State Compact. Dkt. 28 ¶ 9. Due to the deadlines mandated by the Tribal-State Compact, lead testing engineers were required to timely complete electronic gambling testing of tribal submissions. Dkt. 27-2 at 3.

In addition to testing the equipment, North was responsible for advising and training stakeholders and regulatory staff in person. Dkt. 28 ¶ 4; *see* Dkt. 27-2 at 4 ("Tasks include: . . . Provides hands-on training to small groups and individual[] gambling regulators on performing inspections, system of structure, security weaknesses and mitigation techniques. . . . Assists in

the design and development of formal training classes for regulators."). Approximately ten percent of North's annual workload was spent on training. Dkt. 34 ¶ 5.

**B.      Washington State COVID-19 Vaccination Mandate**

On January 20, 2020, the U.S. Center for Disease Control & Prevention ("CDC") and the Washington State Department of Health announced what they believed to be the first confirmed case of COVID-19 in the United States in Snohomish County, Washington. Dkt. 29-1 ¶ 9. Shortly thereafter, the U.S. Health and Human Services Secretary Alex M. Azar II declared a public health emergency. *Id.* ¶ 10. COVID-19 is caused by the SARS CoV-2 virus, which spreads from person to person through very small airborne respiratory droplets that are produced when an infected person exhales, coughs, sneezes, or talks. *Id.* ¶ 7–8. Though there is a delay of at least a few days after exposure and onset of symptoms, individuals can spread the virus before they experience any symptoms. *Id.* ¶ 8. Some patients experience mild to moderate symptoms while others require hospitalization and intensive care treatments. *Id.*

Governor Jay Inslee issued Proclamation 20-25 (Stay Home—Stay Healthy Order) throughout the state on March 23, 2020. *See* Dkt. 29-5. In response to the Governor's order, Commission employees temporarily worked remotely, but they returned to in-person work earlier than other agencies because of the Commission's law enforcement functions. Dkt. 27 ¶¶ 4–5. The Lab also temporarily closed and lead testing engineers were only able to complete "documentation only" submissions. Dkt. 28 ¶ 11; *see* Dkt. 34 ¶ 14 ("Up until September 2020 [North] only had remote submissions which [she] could test remotely."). Documentation only submissions are "limited submissions that do not strictly require hands-on analysis of equipment or software" and "generally make up a substantial minority of the submissions the Lab handles." *Id.* But because the COVID-19 virus also significantly impacted equipment manufacturers, there was a substantial decrease in the number of submissions that the Lab received at that time. *Id.*;

1    *see* Dkt. 34 ¶ 14 ("Tribal partners and vendors were also shut down as they were 'non-

2    essential.'").

3         But by September 21, 2020, equipment manufacturers began increasing their submissions

4    and the Lab reopened for in-person work. Dkt. 28 ¶ 12. The Lab operated on "a limited basis to

5    accept and test any submissions that could prevent system failures, correct noncompliance with

6    the law in deployed systems, or were deemed emergency fixes or critical to the Commission's

7    mission." *Id.* Though equipment manufacturers were allowed to visit the Lab, they could send no

8    more than three representatives at a time. *Id.*

9         By February 2021, the U.S. Food and Drug Administration ("FDA") had issued an

10   Emergency Use Authorization ("EUA") for two vaccines against the COVID-19 virus—the

11   Pfizer and Moderna vaccines. Dkt. 29-1 ¶¶ 15–16. The FDA evaluated the vaccines and found

12   that after the second dose, the Pfizer and Modern vaccines had a near 95% efficacy rate in

13   preventing confirmed COVID-19 cases in trial participants. *Id.* ¶¶ 21–22. But during this time,

14   the original strain of virus, SARS-CoV-2, had evolved, creating different variants such as the

15   Delta variant which contributed to additional hospitalizations and deaths in Washington state.

16   Dkt. 29-2 ¶ 5; *see* Dkt. 29-3.

17        On August 2, 2021, the Commission began accepting all submissions from manufacturers

18   and the Lab operated at full capacity. Dkt. 28 ¶ 13; *see* Dkt. 33-1 at 67. Later that month, on

19   August 20, 2021, Governor Inslee issued Proclamation 21-14 (the "Proclamation") requiring that

20   all state employees receive the COVID-19 vaccine by October 18, 2021. Dkt. 29-14. The

21   Proclamation also required state agencies to create an accommodations process for individuals

22   seeking medical or religious exemptions as mandated by federal and state law. *Id.* at 6–7.

23   Following the Proclamation, the Office of the Financial Management ("OFM") sent emails to

24

Human Resource directors in state agencies providing sample communications to send to employees about the accommodations process. *See* Dkt. 33-1 at 15–16, 25.

**C.    The Commission's Religious Exemption Process**

The Commission sent out a religious exemption request form to its employees on August 31, 2021. *See* Dkt. 33-1 at 8–10; Dkt. 27-3. In that form, employees were asked to complete an initial intake questionnaire and provide responses to questions about their sincerely held religious belief. *See, e.g.,* Dkt. 33-1 at 9 ("Please explain how a COVID-19 vaccine conflicts with your asserted strongly held religious beliefs.").

*1.    North submits a religious exemption request.*

On August 13, 2021, North sent Human Resource Consultants Ryan Miller and Lisa Benavidez an email stating that she believed she qualified for a religious exemption from the vaccine mandate. Dkt. 34 ¶ 10. Miller responded about the first steps of the accommodations process and North replied that she would provide a statement in writing. *Id.* On August 31, 2021, North submitted her religious exemption form. Dkt. 27-3. In that form, North attested that she had a sincerely held religious belief that prevented her from receiving the COVID-19 vaccine. *Id.* at 2. North also attached a statement where she stated: "As a Christian I'm convicted to err on the side of spiritual caution and refuse to risk harming my body—the temple of the Holy Spirit." *Id.* at 3. North further explained:

> If I had used any medicines or vaccines with aborted fetal cell lines it was before the Holy Spirit made me aware and convicted me thereof. A Christian need not refuse all medical treatments, but Jesus said . . . "it is not the healthy who need a physician but the sick" (Mathew 9:12). I'm within my faith to seek treatment when I become sick. Believing it's a sin to bypass my God's given systems to be injected with a foreign substance that is unclean. (Romans 14:14-23).
>
> . . .
>
> I must strive to refrain from activity and actions that can harm (desecrate) my body. I now live my life to glorify God in what he has designed as "very good." Ref

(Genesis 1:27-31) From a place of brokenness, I renewed my faith discovering it wasn't enough just to listen to God's word but to do what it says. I asked for wisdom. The Holy Spirit inside me given to me by God has made it clear to me that he doesn't bless these vaccines and will not serve his purposes or glorify him. (1 Corinthians 10:31) If there is any room for doubt as to whether [it] pleases God, then it is best to give it up. "Everything that does not come from faith is sin." (Romans 14.23).

*Id.*; *see* Dkt. 34 ¶ 10. Three of the Lab's six full-time employees, including North, requested accommodations from the vaccine mandate. Dkt. 28 ¶ 14; Dkt. 27 ¶ 13.

       2.     *The Commission grants North's religious exemption but determines that North cannot be accommodated because of her in-person responsibilities.*

      The Commission granted North's religious exemption and moved her application to the interactive accommodation process. Dkt. 27 ¶ 14. In determining whether North could be accommodated in her current position without getting vaccinated, the Commission consulted with North, its Chief Information Officer, and the Electronic Gaming Lab Manager. *Id.* ¶ 17. Because North's position required interacting with Tribal Casinos and the Tribal Gaming Unit, the Commission also consulted with the Tribal Liaison and the Tribal Gaming Unit's Agents in Charge. *Id.*

      The Commission considered many factors, including North's in-person responsibilities in the Lab and in tribal casinos which would result in contact with equipment manufacturers, other Commission employees, and members of the public. *Id.* ¶ 18; Dkt. 33-1 at 71. For example, as North acknowledged in her deposition, manufacturer representatives "regularly visit the lab . . . to deliver equipment, upgrade servers, provide trainings on equipment under review and assist lead testing engineers troubleshoot[]." Dkt. 28 ¶ 6; *see* Dkt. 33-1 at 45 ("Q. And so between July 27th and July 29th, it looks like there were representatives from manufacturers in the lab every day, correct? A. Yes."). Lead testing engineers also "regularly offer demonstrations of equipment, which can draw 40 or more individuals to the Lab in close proximity." Dkt. 28 ¶ 6.

Due to limited Wi-Fi connection, the Lab did not have direct access to the agency network, requiring lead testing engineers to also maintain a workspace outside of the Lab in the adjoining Commission office space. *Id.* ¶ 7. After the Lab fully opened and accepted all submissions, vendors began submitting at pre-COVID levels. *Id.* ¶ 13. North admitted in her deposition testimony that to complete her work, she needed to be in the Lab three to four times a week. *See* Dkt. 33-1 at 46–47 ("Q. How often did you go into the lab, approximately? . . . Q. Four times a week? A. Probably three to four, yes. Q. And that's because the submissions required you to be doing work in the lab three to four days a week, correct? A. Yeah. Depending on the submission that I got, yes."); *see also id.* at 49 ("Q. . . So there was four technicians and a lead worker who were going in potentially three to four days a week, correct? A. Yes."). The engineers used their workspaces to write summaries and reports of their tests. Dkt. 28 ¶ 7. And because their computers had certain programs that they used to test equipment and software, the engineers went back and forth from the Lab to their workstations several times throughout the day. *Id.*

Additionally, lead testing engineers were required to go on-site into casinos to test gambling equipment in deployed settings, and these visits were generally performed during the casino's regular hours when casino patrons were present. *Id.* ¶ 9. North was also required to "provide trainings to Tribal Representatives and agency staff on how to operate approved electronic gambling equipment and verify the equipment is legally compliant in the field." *Id.* ¶ 8. The Commission continued to hold in-person trainings throughout 2021. *Id.*; *see* Dkt. 33-1 at 43 ("Q. . . . So in August 2021, in the middle of the pandemic, you still had two in-person trainings; is that correct? A. Yes, that's correct. Q. And between June 2021 and August 2021, . . . you still had three—at least three in-person trainings, correct? A. Yes. Q. So even in the middle

of the pandemic, you would have in-person trainings multiple times per month if circumstances called for it? A. Yes.").

Because a substantial portion of North's duties required in-person contact, the Commission determined that the only accommodation available for North would be reassignment to a position that did not involve in-person contact. Dkt. 27 ¶ 19. North met with Miller who explained she would need to submit an email and attach an updated resume to seek reassignment. Dkt. 34 ¶ 10. But when North asked Miller whether there were any vacant positions available for reassignment, Miller did not provide any information about available positions. *Id.* North then confirmed with her supervisor Melissa Chicone that there were no positions North could be reassigned to. *Id.* North did not submit a request for reassignment. Dkt. 27 ¶ 22.

**D.    North's Termination from the Commission and Lawsuit**

The Commission ended North's employment on October 18, 2021. *Id.*; Dkt. 34 ¶ 19. On March 17, 2023, North sued the State of Washington, the Commission, and John and Jane Does 1–10 in Thurston County Superior Court. Dkt. 1-1 at 2; *see* Dkt. 1-3. North alleged that Defendants were liable for failing to accommodate her religious beliefs in violation of Title VII, 42 U.S.C. § 2000e. Dkt. 1-3 at 5–7. North amended her complaint in state court and added a claim for religious discrimination in violation of the WLAD, RCW 49.60.180. Dkt. 1-5 at 7. Defendants removed the case to this Court based on federal-question jurisdiction. Dkt. 1; *see* 28 U.S.C. § 1441(a).

On June 27, 2023, Defendants moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). Dkt. 4. The Court granted the motion to dismiss, finding that North's Title VII and WLAD failure-to-accommodate claims failed to meet the *Iqbal* pleading standard. Dkt. 16 at 4–5. The Court also dismissed the Doe Defendants because North used "John or Jane

Does 1–10" as an impermissible "catch-all to encompass any possible additional party." *Id.* at 6. North, however, was granted leave to amend her complaint, *id.* at 7, and she timely filed an amendment, Dkt. 17.

On July 14, 2025, Defendants moved for summary judgment on all claims, arguing that (1) North has not established a prima facie claim for religious discrimination because she does not identify a religious conflict between the COVID-19 vaccination and her stated religious beliefs; and (2) allowing North to continue her work unvaccinated constituted an undue hardship because she posed an unacceptable health and safety risk to others. Dkt. 25. Defendants also moved to exclude North's proffered expert, Dr. Harvey Risch, which the Court has granted in a separate order. *See* Dkt. 47. Plaintiff responded, Dkt. 31, and Defendants replied, Dkt. 40. The motion is ripe for the Court's consideration.

### III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, "the moving party has the burden of proof at trial (such as a defendant seeking summary judgment based on an affirmative defense) he must demonstrate that no reasonable trier of fact could find against him." *Intelligent Peripheral Devices, Inc. v. SmartPad, Inc.*, No. C95-4479-FMS, 1998 WL 754606, at *2 (N.D. Cal. Oct. 26, 1998) (citing *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)); *see also Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (recognizing that a defendant bears the burden of proof at summary judgment with respect to an affirmative defense). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The evidence relied upon at summary judgment must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

## IV.    DISCUSSION

**A.    Failure to accommodate under Title VII and the WLAD**

Defendants move for summary judgment on North's claim that the Commission failed to accommodate her religious beliefs in violation of Title VII, 42 U.S.C. §§ 2000e–2(a)(1), and the WLAD, RCW 49.60. Dkt. 25 at 16–29; Dkt. 40 at 6–19; Dkt. 17 ¶¶ 23–37.

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" that individual's

religion. 42 U.S.C. § 2000e-2(a)(1). An employer must "reasonably accommodate" an employee's religious practice unless such accommodation would impose "undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Similarly, under the WLAD, employers may not refuse to hire, discharge, bar from employment, or discriminate against in compensation or other terms of employment any person because of their religion. RCW § 49.60.180; *see Kumar v. Gate Gourmet, Inc.*, 180 Wn. 2d 481, 500–01, 325 P.3d 193 (2014). The WLAD also creates a cause of action for failure to reasonably accommodate an employee's religious practices. *Kumar*, 180 Wn.2d at 500–01. To sustain a WLAD failure-to-accommodate claim, Plaintiff must put forward evidence supporting substantially the same elements as a Title VII failure-to-accommodate claim. *See id.* at 501–02. Accordingly, the Court considers the state and federal claims together.

To prove a Title VII failure-to-accommodate claim, a plaintiff "must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004) (citing *Heller v. EBB Auto. Co.,* 8 F.3d 1433, 1438 (9th Cir. 1993)). "Once an employee establishes a prima facie case of failure to accommodate religion, the burden shifts to the employer to show 'either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998)). The "undue hardship" defense is a complete defense to Title VII and WLAD failure-to-accommodate claims. *See* 42 U.S.C. § 2000e(j); *Kumar*, 180 Wn.2d at 501–02.

1       *1.*      *North has put forward sufficient evidence to support a prima facie case of failure to accommodate religion.*

2

3       Defendants argue that "North cannot establish a prima facie Title VII claim because the record conclusively establishes her objection to the COVID-19 vaccines was not religious in nature." Dkt. 25 at 16. Defendants cite to cases where courts in the Ninth Circuit granted summary judgment for the employer because the plaintiff raised objections to the COVID-19 vaccine that were not based on or related to a sincerely held religious belief. *Id.* at 17–18; *see, e.g., Fisher v. Dep't of Fin. Insts.*, No. C22-5991 TSZ, 2025 WL 1434366, at *3–10 (W.D. Wash. May 19, 2025) (dismissing the plaintiffs' failure-to-accommodate claims because they relied on their conscience and "divine directive" to explain their religious beliefs instead of articulating any specific religious doctrine that prevented them from receiving the COVID-19 vaccine).

      Defendants contend that North raises similar non-religious, conscience-based objections to the vaccine mandate. Dkt. 25 at 18. As evidence, Defendants point to North's request for a religious exemption where she stated, "The Holy Spirit which resides in me and helps guide me to do what's pleasing to God." *Id.* at 19; Dkt. 27-3 at 3. Defendants also note that North testified, "for Christians, that's kind of the Holy Spirit. Anybody else, it's kind of having a gut instinct if you should do something or not[.]" Dkt. 26-1 at 11. When North was asked about why she objected to receiving the vaccine, North responded, "I had to pray about it a lot to know how my sincerely-held belief and my conscious whether I should do something or not do something, I just felt like I needed to follow what God was telling me to do." Dkt. 33-1 at 39. North explained that God "did not want to put anything foreign into my body, which, at this time, was what was being presented as COVID-19 vaccines." Dkt. 26-1 at 65. When asked whether she knew why God told her he didn't want her to get vaccinated, North responded, "No, He just—I mean, it was

a sincerely-held belief and it was, like, anybody that's not a believer would probably treat it like a gut." *Id.* Defendants argue that North's "interpretation of the Bible to grant her full authority to decide what she should and should not do to her body is the type of 'blanket privilege that does not suffice as a bona fide religious belief.'" Dkt. 25 at 19 (quoting *Fisher*, 2025 WL 1434366, at *3).

Defendants also argue that North's testimony confirms that her objections to the vaccine were medical, rather than religious. *Id.* at 20; *see* Dkt. 26-1. They point to North's testimony where she said she believed that the threat from COVID-19 was hypothetical because she "was seeing that people that were vaccinated got sick with COVID . . . so it wasn't protecting against transmission." Dkt. 26-1 at 17; *see also id.* at 12 ("Q. . . . . you didn't think the vaccine was effective, correct? A. It appears to me from what I witnessed, yes. . . . There were deaths, there were different things that—disabilities that people received from it, adverse effects."). Defendants contend that though North's objections are "couched as a religious one," they are based on her skepticism of the vaccine's efficacy and belief in her natural immunity. Dkt. 25 at 21. Since secular opposition to the vaccine mandate is not protected under Title VII or the WLAD, Defendants maintain North has not set forth a prima facie case for her claims. *Id.*

Plaintiff responds that the Supreme Court and the Ninth Circuit have "cautioned against guessing the reasonableness of an individual's asserted religious beliefs." Dkt. 31 at 9–10 (first citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014); then citing *Bolden-Hardge*, 63 F.4th at 1224). Plaintiff argues that the "entirety of the Christian belief system is that the propitiation of Jesus Christ frees a person from the 'law' and allows them to enter into relationship with God through professed belief in Jesus and accepting of the Holy Spirit." *Id.* at 13. Here, Plaintiff "attests to the Holy Spirit putting James: 4:17 on her heart and in her mind" and "instructed [North] on what was 'good' for her and had she not followed that specific answer

from God she would have been accountable for actions, in taking the vaccine, as sin." *Id.* at 12; *see* Dkt. 33-1 at 40–41. Thus, because "North professes hearing from the Holy Spirit/God/Jesus (not following her conscience)," Plaintiff argues that "there is an issue of material fact between parties regarding Ms. North's bona fide beliefs as to how the Holy Spirit guides her life and whether that belief establishes a religious conflict." Dkt. 31 at 13.

The Court agrees with Defendants that courts within the Ninth Circuit have generally rejected objections to vaccines that stem solely from a "divine directive" because such beliefs amount to "blanket privileges" that do not qualify as a bona fide religious belief. *See Fisher*, 2025 WL 1434366, at *3–5 (citing cases). And though it is true that the Supreme Court has "cautioned against second-guessing the reasonableness of an individual's assertion that a requirement burdens her religious beliefs," this "principle does not mean that courts must take [the plaintiff's] conclusory assertions of violations of their religious beliefs at face value." *Bolden-Harge*, 63 F.4th at 1223.

Here, North made statements in her request for a religious exemption and her deposition testimony referencing "God-given natural immunity" and the "Holy Spirit's directive" that led her to refuse vaccination. *See* Dkt. 27-3 at 3 ("My body contains a God-given natural immune system that safely and effectively thwarts the invading pathogens we normally encounter in the natural world."); *see id.* ("The Holy Spirit inside me given to me by God has made clear to me that he doesn't bless these vaccines and will not serve his purposes or glorify him."). But North also explained that it is against her Christian faith to use "medicines or vaccines with aborted fetal cell lines" and "to be injected with a foreign substance that is unclean." Dkt. 27-3 at 3. The Ninth Circuit and district courts have recognized sincere religious objections to the COVID-19 vaccine based on the use of fetal cell lines. *See, e.g.*, *Keene v. City & Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at *2 (9th Cir. May 15, 2023); *Luxton v. Washington State Dep't*

*of Veterans Affs.*, No. 3:23-CV-05238-DGE, 2025 WL 896658, at \*11 (W.D. Wash. Mar. 24, 2025), *reconsideration denied*, No. 3:23-CV-05238-DGE, 2025 WL 2080575 (W.D. Wash. May 20, 2025) (finding that the plaintiff had pled a bona fide religious belief by explaining he was "unable to take the available COVID-19 vaccines because they used human fetal cell lines in their testing, development, or production stage"). And though North also made secular objections to the vaccine mandate, the "secular reasoning does not 'cancel out' the protected religious objection." *Moore v. Effectual Inc.*, No. 3:23-CV-05210-DGE, 2024 WL 1091689, at \*8 (W.D. Wash. Mar. 13, 2024); *see Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981) ("[A] coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one.").

But most relevant here is that the undisputed record shows that the Commission granted North's request for a religious exemption. Dkt. 27 ¶ 14. By granting the religious exemption request, the Commission accepted that North had a sincerely held religious belief that conflicted with her ability to receive the COVID-19 vaccine. *See id.* Viewing the evidence in the light most favorable to North, the nonmoving party, this fact creates a genuine dispute as to whether Plaintiff had a bona fide religious belief. *See* Fed. R. Civ. P. 56(a). In other words, a reasonable jury could draw an inference in North's favor that she had a sincerely held religious belief because the Commission agreed that she did when it granted her religious exemption request. The Commission contends that "it did not scrutinize the claimed religious beliefs of employees who submitted religious exemption requests[.]" Dkt. 27 ¶ 14. But again, while at trial a jury may credit the Commission's explanation that it did not question employees' religious beliefs, at the summary judgment stage, the Court must draw all justifiable inferences in North's favor. *Tolan*, 572 U.S. at 651; *see Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge."). Accordingly, because the Commission admitted that North had a bona fide religious belief by granting her religious exemption (and because North's request for an exemption referenced specific religious opposition to the development of the vaccines) summary judgment cannot be granted on this basis.

While this motion was pending, the Ninth Circuit issued a decision in *Detwiler v. Mid-Columbia Medical Center*, --- F.4th ----, 2025 WL 2700000 (9th Cir. Sept. 23, 2025). There, Sherry Detwiler sought a religious exemption to the COVID-19 vaccine mandate. Her employer, Mid-Columbia Medical Center, granted the exemption for vaccination but required Detwiler wear PPE while in the office and submit to weekly antigen testing. *Id.* at *3. The antigen testing required that the person insert a cotton swab dipped with ethylene oxide ("EtO") into the nostril and submit the swab to a lab for analysis. *Id.* In response, Detwiler requested further accommodation—specifically, an exemption from the antigen testing because she believed that EtO is a carcinogenic substance and "testing with carcinogens and chemical waste [is] in direct conflict with my Christian duty to protect my body as the temple of the Holy Spirit." *Id.*

The Ninth Circuit noted that the district court had "acknowledged the sincerity and religiosity of Detwiler's belief in her body as a temple and even the implied prohibition on ingesting harmful substances." *Id.* at *7. But the district court ultimately dismissed Detwiler's complaint because her request for further accommodation against antigen testing was not "premised on the Bible or any other religious tenet or teaching, but rather on her research-based scientific medical judgments." *Id.* at *4. The Ninth Circuit affirmed the district court's decision, concluding that "Detwiler's objection to testing is grounded in the secular belief that the nasal swabs in antigen tests are carcinogenic" and she "failed to plead facts demonstrating her belief in the harmfulness of the swabs was related to her Christian faith." *Id.* at *11.

The Court recognizes that *Detwiler* cuts against part of North's argument that following "the voice and command of the Holy Spirit who is God" necessarily creates a genuine dispute of material fact. Dkt. 31 at 13; *see Detwiler*, 2025 WL 2700000, at *9 ("Invocation of prayer, without more, is still insufficient to elevate personal medical judgments to the level of religious significance."). Still, *Detwiler* does not foreclose North's argument that she held a sincerely religious belief that conflicted with her ability to receive the vaccine. Importantly, the Ninth Circuit held that Detwiler's basis for seeking an exemption from *antigen testing*, not vaccination, was secular in nature. The Ninth Circuit's decision did not affect the district court's acknowledgement of "the sincerity and religiosity of Detwiler's belief in her body as a temple and even the implied prohibition on ingesting harmful substances" that led to her employer's acceptance of her religious objection to the vaccine itself. *Detwiler*, 2025 WL 2700000, at *7. And here, North provided a similar reason for rejecting the vaccine, as well as references to the use of fetal cell lines, which *Detwiler* recognized as a specific religious belief. *See id.* at *7 and *8 n.2; Dkt. 27-3 at 3 ("As a Christian I'm convicted to err on the side of spiritual caution and refuse to risk harming my body—the temple of the Holy Spirit."); Dkt. 27-3 at 3 ("We are renewed every time we ask for forgiveness and can turn from our sin. If I had used any medicines or vaccines with aborted fetal cell lines it was before the Holy Spirit made me aware and convicted me thereof.").

Considering *Detwiler* as well as the evidence under the summary judgment standard, the Court concludes that there is a genuine dispute as to whether North had a bona fide religious belief that conflicted with her employment duties. The Court next turns to Defendants' affirmative defense of undue hardship.

2.    *Defendants have established that accommodating North would have been an undue hardship as a matter of law.*

Defendants argue that the Commission could not accommodate North without undue hardship because her "undisputed and extensive in-person and public-facing job requirements" would "risk the health and safety of others." Dkt. 25 at 21; Dkt. 40 at 8–11. The Court agrees that under the relevant Ninth Circuit precedent, there is no evidence from which a reasonable jury could reach an opposite conclusion.

An employer is not required to reasonably accommodate an employee's religious practice if doing so would impose "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). To establish that a particular accommodation would impose undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (citation omitted). "What constitutes undue hardship must be determined within the particular factual context of each case." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999) (citation omitted); *see also Groff*, 600 U.S. at 473 (describing undue hardship as a "context-specific standard"). When an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options. *Groff*, 600 U.S. at 473. Courts must "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71 (citation modified).

Consistent with this guidance, "analysis of an 'undue hardship' defense is not simply a financial or monetary loss calculation," but also encompasses non-monetary considerations. *Suarez v. State*, 3 Wn.3d 404, 427, 552 P.3d 786, 799 (2024); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1134 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir.

Feb. 28, 2025) ("Non-economic impacts on coworkers can be considered, so long as those impacts are not the result of employee animosity to a particular religion, to religion in general, or the notion of accommodating religious practice.") (citing *Groff*, 600 U.S. at 472). "Costs" encompass an "accommodation's effect on co-workers" which "may have ramifications for the conduct of the employer's business." *Groff*, 600 U.S. at 472. Courts' consideration of economic and non-economic costs also includes health and safety risks. *Petersen v. Snohomish Reg'l Fire & Rescue*, --- F.4th ---- , 2025 WL 2503128, at *7 (9th Cir. Sept. 2, 2025) ("*Groff* tells us that we may look to EEOC guidance to help determine if [] health and safety costs would have imposed an undue hardship on [the employer]."); *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1151 (D. Or. 2024) ("Consistent with the pre- and post-*Groff* authority . . . it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission and potential safety risks, in analyzing undue hardship.").

The Ninth Circuit and many district courts have also recognized that the spread of COVID-19 created valid health and safety concerns that can constitute an undue hardship. *See, e.g., Petersen*, 2025 WL 2503128, at *5 (identifying "health and safety costs" to employees and the public as a type of cost an employer would face had it allowed its employees to work unvaccinated); *Doe v. San Diego Unified Sch. District*, 19 F.4th 1173, 1180 (9th Cir. 2021) (citing EEOC guidance that an employee's religious exemption from an employer's vaccine mandate can be denied on the ground that it unduly burdens the employer's business by "increasing 'the risk of the spread of COVID-19 to other employees or to the public.'"); *Bordeaux*, 703 F. Supp. 3d at 1136 ("Numerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis") (citing cases). Finally, "[c]ourts within the Ninth Circuit recognize that 'it is appropriate to confine the [undue hardship] analysis to the

information available to the employer when it made its undue hardship decision.'" *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *9 (W.D. Wash. Nov. 13, 2024) (citing cases).

Defendants have met their burden to show that potential accommodations available —allowing North to work remotely or continue working onsite unvaccinated—would have caused an undue hardship. Defendants argue that North's position as lead testing engineer required regular in-person work. Dkt. 25 at 22; Dkt. 40 at 8. And Defendants further contend that allowing North to work unvaccinated posed a threat to health and safety that could not be mitigated by other measures. Dkt. 25 at 23–27; Dkt. 40 at 10–13. Plaintiff responds that those other measures—masking and testing—could have been used to accommodate North's religious beliefs and allow her to work unvaccinated. Dkt. 31 at 19. Plaintiff argues that because the Commissioner allowed vendors and other guests to enter the Lab without proof of vaccination but with masks, the same should have been allowed for North. *Id.* at 17–18; *see* Dkt. 33-1 at 30 (outside guest requirements for entering Commission office). Plaintiff alternatively argues that the Commission's failure to calculate North's potential risk burden "constitutes public health malpractice" and creates a genuine dispute as to whether accommodating North unvaccinated would have posed an undue hardship. Dkt. 31 at 14, 19–21.

First, Defendants produced uncontroverted evidence that North's job duties required regular in-person contact with co-workers, representatives from equipment manufacturers, tribal partners, and members of the public. For example, North testified that "after COVID-19 emerged and before the vaccine mandate, [she] had direct contact with stakeholders, vendors and tribal members as part of her . . . job requirements." Dkt. 26-1 at 16. This was because a significant part of North's position was to "[i]nstall[], configure[], and troubleshoot[] gambling system software, hardware, and networks in [the] lab environment for testing purposes." Dkt. 27-2 at 3.

North agreed that she could not do this testing outside the Lab. *See* Dkt. 26-1 at 21 ("Q. And the equipment has to be tested in the electronic gaming lab, correct? A. The types of tests that actually require me to be on the system, yes, I would have to be in the lab to test that. Q. Why is that? A. Well . . . there's certain tests that we have to do, I can't do those type of tests remotely because the equipment is in the Lab."). Outside of the Lab, the only locations testing could be conducted were in the manufacturer's facility or a tribal casino. Dkt. 28 ¶ 4 ("because of legal restrictions on the location and use of gambling equipment, [testing] can only be performed on-site either at the Lab, a manufacturer's facility or tribal casino").

North therefore tested deployed systems in tribal casinos. *See* Dkt. 26-1 at 28 ("[W]e have a whole process in place that with the tribal agents and also our tribal unit agents and then ourselves would go onsite and actually audit the systems onsite to make sure they match what was tested and approved."). North testified that testing in tribal casinos "could be frequent" given that there were "either 27 or 29" casinos that could contact the Lab to review their systems. *Id.* at 30. North explained that these visits occurred during regular operating hours and could take anywhere from three to ten hours during the business day and could extend multiple days. *Id.* at 40–41. Typically, Tribal Gaming Unit Agents, the vendor, and North were present for the onsite visits, and North could encounter patrons who were on the casino floor. *Id.*

Apart from testing gambling equipment in the Lab and at tribal casinos, North was also responsible for attending and providing in-person trainings on gambling systems. Dkt. 28 ¶ 4; Dkt. 27-2 at 4 (North's duties included providing "hands-on training to small groups and individuals of gambling regulators on performing inspections, system structure, security weaknesses and mitigation techniques"); Dkt. 26-1 at 42, 44 ("Q. . . . the vendor trainings, I imagine were also generally in person, correct? A. Correct. . . .Q. But even during COVID, some of the trainings were in person, correct? . . . A. Oh, yes."). North further testified that vendor

trainings could occur multiple times a month and in August 2021, during the COVID-19 pandemic, North had two in-person trainings. Dkt. 26-1 at 53. North stated that approximately ten percent of her time was spent on trainings. Dkt. 34 ¶ 13.

Second, Defendants produced unopposed evidence that North's contact with others was frequent, given that she needed to work near other lead testing engineers, manufacturer representatives, and Commission staff. The Lab was North's primary work setting where she tested equipment submissions as one of six lead testing engineers. Dkt. 26-1 at 28 ("So there was boss, Melissa; lead worker, Jamie; and then there was Rodney, Logan, myself and Dan. Yeah, six."). North testified that she went into the Lab three to four times a week, and it would be difficult to schedule a time where North could be in the Lab by herself. Dkt. 33-1 at 47; Dkt. 26-1 at 63.

And even if North could find a time to be alone in the Lab, her workspace was in a shared common space with other Commission offices. Dkt. 28 ¶ 16(d). The workspace was used to write summaries and reports on the testing, and since the Lab had limited Wi-Fi connection, North had to go back and forth from the Lab and workstation throughout the day. *Id.* ¶ 7; *see* Dkt. 26-1 at 25 ("Q. But for purposes of lab technicians in the lab, there's no real internet access, correct? A. Yeah, because it's usually—yeah."); *id.* at 26 ("Q. On a typical day you were in the lab, would you often go back and forth between the lab and your cubicle? A. Yes. Q. Why? A. Oh, gosh, it could be to answer emails, it could be to answer phone calls, or if you had a meeting. Q. So the ability to do that made your job a lot easier? A. Yeah, because you could just walk through the door and you walk into your cube.").

Moreover, the Lab was set up to avoid "islands of knowledge" where "certain expertise of information is only held by a single individual, because that can impair the Lab's operations." Dkt. 28 ¶ 5; *see* Dkt. 26-1 at 31–32 ("Q. Okay. So cross-training on the different manufacturers'

equipment was important, correct? A. Yes. Q. Why is that? A. My boss, or my bosses, used to say during the years: We didn't want to create an island where all of the expertise was in one system, and that person either took another job or retired, then you lose that knowledge."). In other words, even if a lead testing engineer was assigned to one or two manufacturers at any given point, that person was required to cross-train on manufacturers assigned to another lead testing engineer to provide support if needed. Dkt. 28 ¶ 5. Cross-training required working on or observing the same piece of equipment, which put engineers "in close proximity to another for an extended period of time." *Id.*

Apart from North's internal interactions with other staff, North also met with vendor representatives who came into the Lab. Dkt. 26-1 at 35; *see id.* at 36 ("Q. But, depending on the submissions, vendors could come into the lab frequently? A. Yes, Yes."). When asked how many vendor representatives came into the Lab, North responded, "It's usually like one or two. But if it's like, a brand new system that we have not seen, like, have to install the whole system, you might see more of their representatives there, but I wouldn't say more than ten that I've witnessed[.]" *Id.* at 36. North also explained that there could be representatives from up to seven different vendors in the Lab at the same time. *Id.* at 37.

Third, Defendants produced unopposed evidence that North could not be accommodated without being vaccinated because the previous protocols— PPE, testing, and social distancing— were insufficient to manage the heightened risk of transmission from North's regular contact with others. Defendants cite to the expert opinion of Dr. John Lynch[1], a board-certified physician in infectious diseases and Professor of Medicine at the University of Washington School of Medicine in the Division of Allergy & Infectious Diseases, and Associate Medical Director of

---

[1] Though Plaintiff disputes many of Dr. Lynch's opinions, *see* Dkt. 31 at 21–23, Plaintiff has not challenged the admissibility of Dr. Lynch's expert testimony.

Harborview Medical Center's Infection Prevention & Control, Antimicrobial Stewardship, Employee Health, and Sepsis programs. Dkt. 29-1 at 3.

In his expert report, Dr. Lynch explained that "use of personal protective equipment is a complement—not a substitute—for getting vaccinated." *Id.* at 17. This is because "a work-based masking requirement applies only while employees are at work" and those "employees may become infected while outside of work[.]" *Id.* While social distancing "can serve as a layer of mitigation," Dr. Lynch noted that "this is complicated by the fact that . . . aerosolized virus remains floating in the air, creating a risk for people who enter a room after the infected person leaves, and for people in adjacent spaces with shared air." *Id.* at 35. But "[v]accines . . . are effective around the clock and are independent of human behavior." *Id.* Citing a study conducted by researchers at the Yale School of Public Health, Dr. Lynch noted that by the end of June 30, 2021, COVID-19 vaccines had "prevented nearly 280,000 deaths and 1.25 million hospitalizations in the United States." *Id.* at 17.

Additionally, testing was not an alternative to vaccination because tests were not always accurate. *Id.* at 19. Dr. Lynch explained that there were two types of tests—polymerase chain reaction ("PCR") tests and antigen tests. *Id.* Though the "sensitivity of [a PCR] test is very good," Dr. Lynch noted that the test "can remain positive for weeks after resolution of infection, during which time a person could be re-infected, and the new infection would not be detected." *Id.* And since PCR tests had to be administered by a healthcare worker, using a swab to obtain specimen and then sent to a lab for testing, it could take a day or longer to obtain results. *Id.* Antigen tests, in contrast, provided same day results, but had lower sensitivity for COVID-19, which meant that a "person could have a negative test while they are in fact infected, allowing them to work and to transmit COVID-19." *Id.* Moreover, antigen tests were not FDA approved

for testing asymptomatic individuals or for screening purposes at the time of North's accommodation decision. *Id.*

Dr. Lynch's testimony supports the Commission's determination that "mitigations such as masking, COVID-19 testing, and physical distancing were insufficient to allow an unvaccinated person to work in proximity to others without posing an untenable health and safety risk." Dkt. 27 ¶ 15; *see id.* ¶ 17 (in determining whether North could be accommodated, the Commission consulted with Commission executives as well as the Tribal Liaison and the Tribal Gaming Unit's agents in charge). This health and safety cost was particularly salient given North's frequent contact with Commission staff and vendor representatives in the Lab and at tribal casinos. *See* Dkt 26-1 at 40–41; *see also Groff*, 600 U.S. at 473 (describing undue hardship as a "context-specific standard").

Finally, Defendants provided uncontroverted evidence that despite the emergence of the Delta variant, COVID-19 vaccines remained an effective tool for preserving the health and safety of its employees and clients. Unlike the earlier variants, Delta "cause[d] more infections and spread[] faster than earlier forms of the virus that causes COVID-19." Dkt. 29-1 at 23 (citing CDC article discussing Delta variant). Still, Dr. Lynch opined that the vaccines continued to reduce a person's risk of contracting the Delta variant. *Id.* (citing CDC article concluding that the "[v]accines continue to reduce a person's risk of contracting the virus that causes COVID-19, including this variant.").

In sum, Defendants have produced undisputed evidence that accommodating North, by allowing her to continue working in the Lab, tribal casinos, and manufacturer facilities unvaccinated would have imposed "substantial increased costs" to its business, resulting in an undue hardship. *See Groff*, 600 U.S. at 473; *Petersen*, 2025 WL 2503128, at *7 ("[W]hen considering undue hardship in the context of COVID, employers should consider if the employee

'works in a solitary or group work setting,' 'has close contact with other employees or members of the public,' and 'works outdoors or indoors.'").

Within this context, the Ninth Circuit has held that "allowing unvaccinated [employees] to keep working in October 2021 would have come at a substantial cost to [the employer]." *Petersen*, 2025 WL 2503128, at *7 ("The objective, unrebutted medical evidence shows that [the employer] would have faced significant health and safety costs by allowing unvaccinated [employees] to continue working, even with accommodations."); *see also Bordeaux*, 2025 WL 655065, at *2 (holding that an "employer need not establish that an adverse health or safety event is *certain* to result from an accommodation to establish undue hardship," and that the "prevalence of COVID-19 in [the area] over the relevant time period [and] the risk of [plaintiff] coming into 'close contact' with an individual testing positive was a real, not a hypothetical, risk") (emphasis in original) (citation modified); *Jackson v. King Cnty.*, No. 2:23-CV-00774-RSL, 2025 WL 2022075, at *6 (W.D. Wash. July 18, 2025) (concluding that "in the context of this case, including defendants' mission, a transit operator's essential functions, the population served, the reduced effectiveness of existing precautions, and the efficacy of vaccines in preventing the transmission of the virus, accommodating an unvaccinated transit operator would significantly increase the risk of COVID-19 infections for the operator and the riding public, thereby posing an undue hardship on the employer."). Defendants have thus established that any accommodation would have resulted in an undue hardship.

       3.    *Plaintiff fails to rebut Defendants' evidence of undue hardship.*

Plaintiff fails to raise a genuine dispute of fact that allowing North to continue working unvaccinated would not have resulted in "substantial increased costs" to its law enforcement mission. *See Groff*, 600 U.S. at 470; Dkt. 27-2 ("The Washington State Gambling Commission's mission is to 'protect the public by ensuring that gambling is legal and honest.'"). Plaintiff does

not dispute that North's primary responsibility was testing gambling equipment in the Lab and in deployed settings at tribal casinos. *See* Dkt. 26-1 at 21, 28, 20. Nor does Plaintiff dispute that her position required frequent interactions with other Commission staff, vendor representatives, and tribal agents. *See id.* at 26, 28, 36.

In her affidavit, North claims that "[i]n Spring of 2021, 73% of my work could be completed from home. It was very doable for me to continue working ~27% of my time in the lab with testing before work and wearing a mask while working." Dkt. 34 ¶ 15. But even accepting this fact as true, North's remote work was made possible because at that time, the Lab was operating on "a limited basis." Dkt. 28 ¶ 12. By August 2, 2021, however, the Lab completely reopened and operated at full capacity. Dkt. 28 ¶ 13; *see* Dkt. 33-1 at 67. This meant that when the accommodation decision was made, North was responsible for taking on a higher load of equipment submissions and it was "no longer possible to allow Lab employees to work remotely more than 1 or 2 days per week." Dkt. 26 ¶ 13.

Plaintiff's main contentions are that (1) vendor representatives and other guests were not required to be vaccinated when they entered the Commission's facilities and (2) the Commission failed to calculate North's potential risk burden of transmission as provided by Plaintiff's proffered expert, Dr. Harvey Risch. *See* Dkt. 31 at 17–23.

First, Defendants correctly assert that the vaccination statuses of non-employees are irrelevant to an undue hardship analysis. *See* Dkt. 40 at 12; *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1310 n.9 (D. Haw. 2022) ("That its customer base and others outside of its employ are on planes daily does not undermine mitigation efforts *within its workforce* or its stated goal of protecting health and safety. Moreover, the pertinent issue is whether Plaintiffs' requested accommodations cause undue burden, not employees' exposure to unvaccinated and untested non-employees."); *see also Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d

412, 436 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) ("[T]he issue is whether granting *employees* an accommodation from the COVID-19 vaccine would impose an undue hardship; the vaccination status of defendant's patients or visitors is not material.").

Second, Plaintiff relies exclusively on the expert testimony of Dr. Harvey Risch to argue there is a genuine dispute that North presented a significant health and safety risk. *See* Dkt. 31 at 19–21. For reasons explained in the Court's prior order, Dr. Risch's expert testimony has been excluded for lack of relevance and reliability. *See* Dkt. 47. But even if the Court had not excluded Dr. Risch's testimony about North's risk burden, it does not create a genuine dispute of fact about the substantial costs the Commission would have faced by accommodating North in her position as lead testing engineer. Specifically, had the Court accepted Dr. Risch's method of calculating "risk burden," Dr. Risch admitted that the correct inputs for the size of North's team and the number of employees seeking vaccine exemptions would mean that 74 percent of expected COVID-19 infections on North's team would have come from unvaccinated employees. Dkt. 30 at 17; *see* Dkt. 26-5 at 41. After conceding this calculation, however, Dr. Risch dismissed the 74 percent risk burden as "a small potatoes issue" because he views the cost of infecting a few members of North's team as "quite small compared to the operations of the whole [Gambling Commission]." Dkt. 26-5 at 41–42. But Plaintiff cannot have it both ways; she cannot persuasively argue that the "risk burden" of an unvaccinated employee is meaningful when it is low but immaterial when it is high. More importantly, nothing in the relevant Ninth Circuit precedent instructs that an employer should disregard an undue health and safety risk to a smaller subset of its employees. Even considering Dr. Risch's risk burden calculation, Plaintiff has failed to contradict Defendants' evidence that accommodating North unvaccinated would have resulted in an undue hardship to the Commission. Accordingly, the Court GRANTS Defendants' motion for summary judgment on these claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## V.    CONCLUSION

For the reasons explained above, the Court GRANTS Defendants' motion for summary judgment (Dkt. 25) and DISMISSES Plaintiff's claims with prejudice.

Dated this 24th day of September, 2025.

Tiffany M. Cartwright
United States District Judge